Our final case this morning is 23-1722 McDougall v. Garland. Ms. Mayor Salins. Good morning, your honors, and may it please the court, Amy Mayor Salins for petitioner Marlon McDougall. This petition asks this court to decide only two questions. First, whether the Board of Immigration Appeals was wrong to conclude that the harm that Mr. McDougall fears, including government actors sodomizing people with police batons or setting a young man's genitals on fire, whether that kind of harm does not meet the legal definition of torture because the government actors lack the required specific intent. And second, whether the agency erred in ignoring evidence relevant to the possibility of torture. With respect to specific intent, the BIA erred in two ways. First, it erred by requiring the petitioner to show that the national government of Guyana acquiesces to the actions of low-level government officials. The CAT, of course, does require a connection between the torture and the government. But per 8 CFR 1208.18A1, that connection need only be shown in one of two ways, not both. The petitioner can either show that the torturers are private actors and the government acquiesces to their behavior, or that the torturers are themselves government actors. Here, the BIA never analyzed the specific intent of the officials engaged in torture. Instead, it just analyzed whether the national government was attempting to address the problem, as you can see on page 5 of the joint appendix, despite the fact that Mr. McDougall had raised that government actors themselves would be engaged in torture. So this is a case where your client didn't allege no evidence that he had been previously tortured, right? That's correct. So why isn't the ability of the government or its initiatives to reduce the probability that he would be tortured if returned to his home country relevant on this issue? Your Honor, I think it's relevant to the likelihood analysis, but that's an analysis that the BIA didn't engage in. The BIA simply found that whatever the likelihood of this harm occurring, it doesn't meet the definition of torture. And so because it doesn't meet that definition, it didn't go on to step 2 of deciding how likely is it that he would actually face torture. And we would ask that on remand, the agency take up that likelihood analysis and determine how effective are these government programs, how effective is this new legislation in addressing these issues. But what the BIA did here is hang its hat on specific intent. And in that sense, it was problematic because it essentially immunized the extrajudicial actions of low-level officials from the CATS scope. In matter of OFAS, the Attorney General said that that's wrong because it resurrects the now defunct rogue official test. And what the BIA here should have done instead was separately analyze the intent of the torturers and then their connection to the government. This is one thing I was confused about in your briefing. What torturers are they supposed to be analyzing? They should be looking at the intent of the individuals who are engaged in the actions, the heinous actions like sodomizing people with a police baton. So you have these actions. They don't have any relationship to the alien in this case, correct? Well, we would argue they do relate to the... So how? Because Mr. McDougall has the same risk factors as the people that are detailed in the evidence here. He is also a person with physical disabilities, mental health disabilities, a black Guyanese citizen, a deportee with criminal records. So the evidence here pointed to those vulnerabilities and people with those same vulnerabilities who faced horrific, heinous acts when they returned to Guyana. And so in looking at those vulnerabilities, that's what the agency should be thinking about. Is somebody in Mr. McDougall's position likely to face torture? And here they should have looked at the specific intent of the torturers and then their government connection. The second way in which the BIA... So how would they go about doing that? I'm sorry, Your Honor? How would they go about doing that? I mean, do you call for some evidence or something? With respect to specific intent on the individual, I think that this court has said in Oxygen that we use the general criminal law understanding of specific intent. And so in looking at the actions of specific torturers, you want to look at whether they had the intent to commit the act as well as achieve its desired result. And so here, I think there is a big difference between someone who acts recklessly and somebody who sodomizes someone with a police baton. I mean, that seems to be a quintessential criminal act that would meet the basic definition of specific intent. Who has the burden on intent? The petitioner. Okay. So you say you satisfied the burden by the evidence in the record describing these various admittedly heinous acts, and even though you don't have any individual official saying, yeah, I did this with the intent to torture, that essentially the facts and the acts speak for themselves. Yeah, I think that you can infer intent, and this court has held as much as Oxygen. I think the general rule in criminal law is that an inference of intent by the fact finder is okay. But here the BIA didn't even go into that inference of intent. It simply said that you can't show intent here because, first, the national government isn't acquiescing to the actions of these low-level officials. But then secondly, the BIA concluded that inadequate training defeats the specific intent of the torturer. And that's problematic for two reasons. First, it's problematic because an inadequately trained officer still acts under color of law. In matter of OFAS, the attorney general said that under color of law from our civil rights jurisprudence is the same thing as official capacity in the CAT context. And so civil rights jurisprudence is instructive. And this court's jurisprudence, as well as the Supreme Court's precedent, has been quite clear that even where officers overstep their authority or abuse their authority, they still act under color of law. Lack of training isn't the relevant analysis. If you take, for example, this court's case in Worth v. Searles, which took up the case of a highway patrolman who had crossed state lines to arrest a suspect, this court rightly didn't analyze whether the officer who effectuated that arrest needed more training on extradition procedures. He probably did. But instead it focused on the rights of the defendant, the rights of the suspect. Because 1983, like the CAT, is supposed to protect people from government abuses. In a more gruesome example, the Supreme Court in Screws took up the case of two police officers and a sheriff who arrested a young black man on the pretense that he had stolen attire. They handcuffed the man and beat him to death outside of a courthouse. And there the Supreme Court said that those officers acted under color of law. They were officers who made an arrest. They allegedly beat the man to keep him from escaping, the suspect from escaping, and to protect themselves as officers. Those officers obviously overstepped their authority and abused their authority, but they still acted under color of law. In matter of JGR, the agency said that... So, but in all those cases, you've got the ability to take the evidence of the individuals involved and including the law enforcement officers. And maybe I'm just not picking up on the threads of your argument here, but I'm still not sure exactly how the IJ or the BIA was supposed to determine the specific intent of these completed actions in the past. Because other than the fact of the actions, there's no evidence, is there? Well, I think that the agency, the fact finder, is permitted to make inferences about the specific intent of the torture, just like they make inferences on what the torturer is thinking or what the persecutor is thinking in all kinds of other contexts. All right, so let's just take the case of the person who was sodomized there. What inference are they supposed to draw from that that relates to your client's case? I think they can draw that that officer was not acting negligently or recklessly. No one accidentally sodomizes someone. That officer clearly was acting purposely. And so if you know that there are officers who act purposely in that manner against people with the same vulnerabilities that my client has, that is strong evidence that this person... And so there's evidence in the record that shows that your client matches up with whoever this victim was? Yes, Your Honor. The record shows multiple instances of people who have similar vulnerabilities to my client. So, for example, the disproportionate targeting of black men, we have evidence highlighting that on page 308 of the joint appendix. On page 506, there's a uniformed police officer tackling a black man to the ground and using handcuffs to beat him repeatedly. On page 508... Help me understand why... I understand, you know, we could look at any city in America, right? And so we can find examples. The question is, like, how do we know the specific intent in any one of those examples that you want to give, you know, was to torture on account of being black or being disabled or being whatever, right? I mean, I certainly understand that the examples you give are examples of misconduct. And bracket for a minute whether a handful of misconduct shows a likelihood of torture. But why do we even know that those were, like, the type of specific intent that matters for our purposes? Well, Your Honor, there's no nexus requirement under the CAT, so it doesn't have to be on account of race or something like that. Rather, those vulnerabilities go to whether my client in particular is likely to experience the same type of harm. But specific intent is just about whether the actor intends the consequences of his actions or whether instead it's a lower mens rea of recklessness or negligence. What we're talking about here is not reckless behavior. It's not negligent. It's not even gross negligence. There were examples in the record of things that are criminal because they meet that specific, that higher mens rea standard. So just so I don't hate to beat this dead horse, but I thought your argument, correct me if I'm wrong, your argument is that the BIA and the IJA never engaged with this issue of intent. They didn't. They simply looked to the government efforts to stop this violence and said that that negated intent, and that's not the right analysis under your view. That's correct that that's not the right analysis. They did engage with this idea of intent, but in so doing I think they erred because first they confused the mens rea requirement and which actor they were supposed to be looking at, and then with regard to the specific actors involved, they concluded that inadequate training defeats specific intent of the torturer, and that's problematic under the civil rights framework. It's also problematic because ignorance of the law is no defense to a specific intent crime. So is there any way that we could affirm nonetheless or deny the petition by taking Judge Richardson's point that based on this record evidence, in the absence of any direct evidence of the officer's intent, there isn't enough to go? Well, even if this court disagrees with me on specific intent, it still ought to remand this case to the agency because the BIA did not address evidence of increased risk for black Guyanese people, people with physical disabilities, deportees, or people with criminal records, and while the government says that this is just an example of lack of clarity, the BIA only discusses risk due to mental illness and has one line in its decision alluding to the general population's treatment of criminals on page six of the joint appendix, but there's nothing on police or state actors' treatment of criminals and no reference whatsoever to the risk for black people, deported people, people with physical... I'm sorry, wait, tell me, so you think you have a stand-alone torture of criminals argument independent? I understood your criminal argument to be dependent upon your mental illness argument, that because he's mentally ill, he is then going to go commit criminal acts and therefore get treated as a criminal because he's committed criminal acts. No, Your Honor, we would note that he is at increased risk for torture based on stigma against people with criminal records as well, and under Kerr and Rodriguez-Arias, the agency should... I know, but that's a separate argument. Go back to the idea... Are you making a separate argument about him committing criminal acts and then being mistreated? I think it's both, Your Honor. He could have a mental health crisis that causes him to engage in criminal acts, but he also faces... And is that sufficient? I guess the question is, is it the fact that he could commit criminal acts and then be punished for those criminal acts? No, I don't think that that is sufficient in and of itself. What we're saying is that he is at increased risk of torture, both because he could decompensate and have a mental health crisis that causes that, but also because people with criminal records are at greater risk of torture simply because of the stigma and the way that police and other government actors treat people like Mr. McDougall. Just so I can find it, what is the evidence that you offered on that specific point, the fact that he committed crimes in the United States will make him likely to be tortured in his home country? Yeah, so on page 589 of the Joint Appendix, you'll see the law about deportees with criminal records being subject to monitoring by the police, and then page 565, 571, 568, we all have information about deportees with criminal records being at increased risk. But I don't understand that to be any, so yes, they're monitored, perhaps that's a really good idea, right? If we had criminals coming into our country, I think it would be great for us to monitor them too. The question is, why does that, what does that evidence tell us about that he is likely to be tortured? I think it does go to likelihood. Where police officers are engaging these kinds of heinous acts, we need to know how likely is it that he's going to be in contact with police, how likely is it that police are going to engage in acts that, but frankly, this court need not decide that, because the BIA didn't decide it. The BIA didn't do the analysis of how likely is he to face torture. And it's something that the BIA should certainly do on remand, but all the BIA did here is look at whether the government actors had the specific intent to torture him. And in doing that analysis, they erred in their understanding of the legal requirements for specific intent. And so respectfully, Your Honor, we would ask that the court vacate the BIA's decision and remand for the agency to do that analysis in the first instance. Thank you, counsel. Thank you. May it please the court. Jacqueline Hagner on behalf of the Attorney General. The record here does not compel the conclusion that the government of Guyana specifically intends to torture Petitioner, that the government would acquiesce to his torture, or that he would face a likelihood of torture upon return to Guyana. I'll begin with the issue of specific intent. In fact, Judge Agee, I'd like to turn to your question for Petitioner, which was, how do you show specific intent? The answer to that question is actually what this court discussed in Oxygen. In Oxygen, we were dealing with deplorable prison conditions in Haiti for criminal deportees. And ultimately, the court in that case said, we just don't have evidence of specific intent here. What we have is that, essentially, we have all these criminal deportees, and it's just unfortunate that these prison conditions exist. But the evidence is just, the record is just void of any evidence that the Haitian government specifically intends to torture these deportees. However, that's different than the evidence that appears to be in this record of specific acts that seem to be just really virulently violent and heinous that might, a reasonable person might infer that the officers in question intended to torture somebody. So the question is, did the IJ and BIA conduct the correct legal analysis? And you might win in the end, I suppose, with the argument that even if these incidences occurred, that the government of Guyana has now taken steps that would make it less than likely that this particular petitioner would be tortured. But that's a separate issue on whether or not the IJ and the BIA engaged with the correct legal analysis on the front end. Yes, Your Honor. I have two answers to your point there. I think that it's important to look at, if I may go back to Oxygen, what this court did was it looked at the Ninth Circuit decision in Redour. In Redour, there was evidence from an expert who testified about specific intent of the Haitian government. That expert said that there was a national policy in Haiti to torture criminal deportees. And the expert explained why there was that national policy and what evidence showed that. That type of evidence, that nature of evidence, is absolutely absent from this record. And so inference, as you said, Your Honor, Judge Diaz, that we have these brutal acts by police in the records. These brutal acts, maybe you could infer that there was an intent to torture, but I would submit that an inference does not compel the conclusion. So where does the BIA and IJ actually do that analysis other than to say, as your colleague on the other side says, that while the government has taken all these steps to ameliorate the violence, so therefore there's no intent? Right, Your Honor. I think that's a great question. It would be on page four of the board decision, which is page six of joint appendix. In the first full paragraph, this is where the board says, We affirm the immigration judge's finding that the respondent did not establish a sufficient likelihood that he will be tortured, in quotation marks, by government officials. So what we're doing here, what the board is saying here, is that the definition of torture, what petitioner claims to happen, is speculative. In addition to that, the board cites to this court's decision in Singh, which Singh stands for the proposition that the mere existence of human rights violations in the record is not sufficient to show a likelihood of torture. In addition to that, the board also cited this court's decision in Ibarra-Chavez. In Ibarra-Chavez, that case stands for the proposition that just because a particular individual has certain characteristics that might make him susceptible to torture, does not itself establish a sufficient likelihood of torture. So to kind of sum up what the board did here, is it basically said that the government of Guyana does not specifically intend to torture. Moreover, all of these incidents of harm that petitioner manages to find newspaper articles, isolated incidents of police brutality, are not particularized to petitioner. I think petitioner seems to suggest that he has the same characteristics as some of these victims in these newspaper articles, and because of that, he's going to be just like them. That certainly just does not rise to the level of compelling the conclusion that he will indeed suffer torture. So can I ask, just to be clear, if the finding in this case by the board had been, and you read something that suggests it might not be, that notwithstanding this record evidence of these horrific incidences of torture, the BIA finds the government of Guyana does not acquiesce in that torture, therefore there's no intent. That's a mistake, right? I would tend to agree with you, Your Honor. I think that it's confusing or conflating two issues. I think the best way, but it's two different elements. So government acquiescence is one aspect of the claim, but there's also specific intent. Basically, the board did not get to the issue of government acquiescence. I understand that the immigration judge did, but that was not expressly adopted by the board here. The board rested its decision on specific intent and lack of sufficient likelihood of torture. So government acquiescence, to be clear, is simply not before the court in regards to harm at the hands of government actors. It is before the court in terms of harm at the hands of other individuals, like detainees and the public at large. But at the hands of government actors, government acquiescence is simply just not relevant. That issue is just not harmed by the board. And that's because the evidence with respect to government actors based on these prior incidents is just too speculative? Correct. Essentially, it's not torture. Without specific intent, you simply don't have that requisite element of torture, which, again, this court's decision in Oxygen sufficiently explains that. And as the board did here, refers significantly to the board's decision in matter of JE, which explains why specific intent is required for torture. I would like to make clear, I think that we did just make clear, but I'll just be ultimately clear here, that the board did hold that there's no likelihood of torture at the hands of government actors. And just to reiterate, the reason for that is the board's citations to this court's decisions. And seeing a Barra-Chavez, and quite frankly, it's the last sentence of the board's decision, is that petitioner has not met his burden to establish a likelihood of future torture and be on a fire with the acquiescence of the government. And in addition to that, on page four of the board decision, the first full paragraph also makes a similar decision, affirming the immigration judge's decision on that matter. Also, I would like to address petitioner's argument that the board ignored, or the agency ignored evidence regarding harm to individuals who are criminals or have dark skin or disabilities. That is also simply not true. Here, the board on page four of the decision states that the immigration judge clearly did not err in finding that the government of Guyana does not intend to torture its citizens. So, in finding no clear error of the immigration judge's decision on that matter, that it is expressed affirmation or adoption of the immigration judge's decision on that issue, you look at the immigration judge's decision, and the immigration judge's decision, you see, is pretty thorough in discussing the evidence that was presented, and the immigration judge's decision expressly mentions those grounds on which petitioner now claims the agency ignored. So, those grounds are expressly mentioned in the immigration judge's decision. Moreover, on page 10 of the immigration judge's decision, the immigration judge then aggregates all claimed sources of harm and says that it's just too speculative. Citing a matter of JFF for the proposition that we have a series of suppositions here, each one of which petitioner has not established that is more likely than not to happen, and for that reason is claimed as just too speculative. So, your view is that in certain instances, the board independently analyzed certain issues, and therefore we rely solely on the board, but in certain areas, we can rely on both. Correct, Your Honor. And that's even though there's no indication that the board expressly adopted the IJ's opinion, right? We kind of have to infer that? On that last matter, Your Honor, I disagree, and I'll explain to you why. So, I will agree that the agency decisions here are confusing in terms of what the board affirms with the immigration judge. However, if you were to go through the board's decision line by line, you will see that it is replete with findings that the board's affirming, agreeing, finding no clear error, and then citing two pages of the IJ's decision that it affirms, agrees, or finds no clear error. I mean, it's hard to think about anything. If you say there's no clear error with the judge's finding, if that's your conclusion, how would, I guess, that seems to naturally incorporate the conclusion, right? If you're not saying that it's right, you're not necessarily saying that you adopt that conclusion. You're saying there's no clear error with that conclusion, that would seem to necessarily adopt it, wouldn't it? Yes, Your Honor. It would necessarily incorporate, which is... Incorporate is the better word, right? Right, and that word incorporate is the exact word that was used by this court in Sierra Rivera, which, granted, is an unpublished decision, but the reason Respondent cites that case in its brief is because it addresses the specific circumstances of the board's decision that are similar to this case, which is when the board says clear error, or we find no clear error, that that means that it incorporates the IG's decision. Does that make sense? Because otherwise, like, when we say there's no clear error with the district court, the only way you can understand that is by virtue of the district court's ruling. Precisely, Your Honor. I agree with you. And, again, to the extent that Petitioner false responded for citing to an unpublished decision, this court has held similarly in published decisions, most recently in February of this year in Santana. This court held that when you expressly reference the immigration judge's decision on an issue, the board's decision then incorporates the immigration judge's reasoning on that issue. So, unfortunately, Judge Diaz, what that means is that going through the board's decision, it is necessary to look at what and when the board incorporates the IG's decision, because it's not on every issue that the immigration judge ruled on, if that helps. I could summarize and say that ultimately what you have before the court, as affirmed by the board, is specific intent at the hands of government actors does not exist, nor does the likelihood of future torture. That does not exist at the hands of government actors. In regards to harm at the hands of other individuals, detainees, or the public at large, what the board affirmed there was no government acquiescence and that there's no likelihood of torture. That would be a summary of what the board affirmed from the immigration judge's decision. If there are no further questions, I can conclude. Thank you. I will conclude by stating that Petitioner is an aggravated felon. He was convicted of carjacking and burglary and sentenced to a total of nine years of confinement. This is something that Petitioner does not dispute, and that is why he's only eligible for deferral removal under the Convention Against Torture. However, his claim lacks merit for the reasons we just discussed and the reasons in the agency's decision, and the court should deny the petition for review. Thank you. Thank you, Ms. Hagner. Your Honor, I'd like to address a couple points that my colleague made. First, on the question of how do you show specific intent, she cites the oxygen. In oxygen, this court gave an example of how one can infer specific intent. The example given was when somebody is kidnapped and then beaten severely. This case also has examples just like that, and this court should follow its own precedent in inferring specific intent of the actors involved in torture. Additionally, I wanted to address a little bit about the immigration judge's decision here. First, my colleague notes that the immigration judge allegedly analyzed other sources of vulnerability, like physical disability, race, et cetera. That simply isn't true. If you look at the IJ's decision, the analysis section begins on page 106 of the joint appendix. In the analysis section, there is no mention whatsoever of physical disability, of race. Instead, although the immigration judge does list all of the evidence at the beginning of her decision, there's no indication that she actually analyzed those vulnerabilities. And so even if this court, in my opinion, wrongly looks at the immigration judge's decision, it's the same problem with ignoring evidence of additional vulnerabilities. With respect to whether the immigration judge's decision should be the subject of review here, it should not. It cannot be that whenever the BIA employs the clear error standard, which is the standard it is required by regulation to employ when reviewing factual findings, that that somehow counts as adoption or incorporation. Adoption or incorporation is like a combination. What about you with Santana? You seem to suggest, in the briefing at least, that there's like a magic words test, right? That if the BIA doesn't use the magic word adopt or incorporate, that it doesn't count. But doesn't at least my recollection of Santana is that the court there was like applying the standard of review, and sort of that the court found sufficiently adopted that they reviewed both decisions. Yeah. I will grant that this court's precedent on this is a little bit mixed. But this court in Martinez and in Mwambura and Cabrera Vasquez has explained why it's so important to look only at the BIA's decision. And now the BIA can incorporate parts of the IJ's decision if it so chooses. But to do that, it has to be explicit about that because otherwise there's a jurisdictional problem here. And so the BIA does do that sometimes. There's a matter of Bourbonno Affirmances. There's times when the BIA explicitly says we adopt the IJ's decision on X, Y, or Z. But that's simply not what happened here. Instead, just like when this court- So you think the standard is that absent magic words, we can only review the BIA? Absent the word, we hereby adopt and incorporate. Absent those words, we can only look to the BIA. And that just doesn't seem consistent with what we've done. I don't think it has to be magic words, but I do think it has to be clear that that is what the BIA is doing, and it is not simply doing its own analysis like it did here. Here it has five paragraphs on specific intent where the IJ had just one. And I see that I'm over my time. Can I ask you one more question? Of course. At the very beginning of your argument in rebuttal, you said that this court could infer intent based on this record, but that's a sufficiency argument. And your colleague on the other side says that the BIA rejected that. And so if that's true, why are we in a position to overturn that? At the very beginning of your argument, you said that we're not in sufficiency land. We're in legal error land. So which one is it? I think you're in legal error land, Your Honor. I think that the board did the wrong legal analysis here. But to be responsive to your questioning from this court about how intent could be inferred, that's what the BIA should have done, what the IJ should have done, but didn't. Instead, what they did was employ the wrong legal analysis here in finding that where the government doesn't acquiesce to the actions of low-level officials or where those officials lack the training needed to know better, that there can be no specific intent. And that is legally wrong. Thank you, Your Honor. Thank you. Thank you both very much for your arguments. We'll come down and greet you and adjourn court for the day.
judges: Albert Diaz, G. Steven Agee, Julius N. Richardson